**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **NARSEAL BATISTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:13-13565** |
| | ) | |
| **FEDERAL BUREAU OF PRISONS,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court are the following Motions: (1) Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction (Document No. 22.), filed on November 15, 2013; and (2) Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 27.), filed on December 2, 2013. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document No. 29.) Plaintiff filed his Responses on February 11 and 12, 2014. (Document Nos. 42 and 44.) Having examined the record and considered the applicable law, the undersigned has concluded that Plaintiff's Motion should be denied and Defendants' Motion should be granted.

**PROCEDURAL BACKGROUND**

On June 6, 2013, Plaintiff filed an Application to Proceed Without Prepayment of Fees and Costs (Document No. 1.) and a form Complaint and formal typewritten Complaint (Document Nos. 6 and 7.) seeking relief pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of

Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971) and 42 U.S.C. § 1985(3).[1] Plaintiff

names the following as Defendants: (1) Federal Bureau of Prisons [BOP], (2) Joel Ziegler, Warden

of FCI Beckley, Beaver, West Virginia, (3) Dominic McLain, Clinical Director at FCI Beckley, (4)

Kevin Thompson, Administrator of the Health Services Department at FCI Beckley, and (5)

unknown John and Jane Does, employees of the FCI Beckley Health Services Department. Plaintiff

alleges that Defendants violated his Eighth Amendment right to adequate medical care by failing

to examine, evaluate and treat him for his intestinal condition which he describes as follows

(Document No. 7, pp. 2 - 3.):

> It is well-documented that before, during and after Plaintiff's arrest by federal
> authorities and subsequent jury trial in the U.S. District Court, Miami, Florida, the
> Plaintiff continuously endured extremely persistent, excruciating and debilitating
> intestinal pain emanating from a yet to be determined source, however, it is believed
> by Plaintiff from the symptoms he is suffering that an unknown parasite continues
> to live, grow, and flourish in Plaintiff's intestinal tract. At the conclusion of
> Plaintiff's criminal proceedings, he was remanded to the custody of the U.S.
> Marshals Service awaiting transfer to the Federal Bureau of Prisons in order to
> satisfy the sentence imposed upon him by the Court. Significantly, from the very
> moment Plaintiff arrived at FCI Beckley, Beaver, West Virginia in 2009, he has
> continually and incessantly sought professional medical treatment from the
> Defendants, physicians and physician assistant(s) in the employ of the FCI Beckley
> Health Services Department. Plaintiff respectfully avers his repeated and frequent
> trips to the Health Services Department have all been for not and met with hostile,
> callous and uncaring attitude by the Defendants with respect to his degenerating
> intestinal abnormality and ailment.

In Count I of his Complaint, Plaintiff alleges that "[t]he violations complained of in this

Complaint include, but are not limited to, deprivation of identifiable civil rights, i.e. the failure

and/or refusal to provide the Plaintiff . . . with prompt, proper, professional and necessary care at

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held
to a less stringent standard than if they were prepared by a lawyer, and therefore they are construed
liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

a time when the same was absolutely essential as a result of the known serious medical needs associated with his long-term intestinal disorder to cause [Plaintiff] physical, mental and emotional harm, pain, humiliation and/or injury, and thereafter, evidence a deliberate indifference to the immediate, grave and serious medical needs of Plaintiff . . ..” (Id., p. 8.) Plaintiff further alleges that Defendants acted pursuant to “policies, regulations and decisions . . . or custom, usage or practice” which caused him harm in violation of his constitutional rights. (Id., pp. 8 - 10.)

In Count II, Plaintiff alleges that Defendants conspired to deprive him of his constitutional rights in violation of 42 U.S.C. § 1985. (Id.) Plaintiff alleges that Defendants engaged in a conspiracy to deprive him of federally protected rights, privileges and immunities by committing “acts of negligence, complete and absolute disregard, fail to care or provide for, and out-and-out abandon with respect to Plaintiff's known serious medical needs.” (Id.) Plaintiff alleges further that “Defendants willfully and maliciously agreed and conspired to engage in a course of conduct that has resulted in a blatant violation of Plaintiff's . . . constitutional rights through their acts of omission and commission. As a direct and proximate consequence of the Defendant's action during the period of Plaintiff's incarceration at Federal Correctional Institution, Plaintiff has endured and sustained permanent damage and injuries, pain, suffering, and resulting infinite harm, devastation and perniciousness to vital organs of his body.” (Id., pp. 10 - 11.) Plaintiff seeks injunctive and monetary relief. (Id., pp. 11 - 12.)

By Order entered on September 12, 2013, the undersigned determined that Plaintiff had stated a Bivens claim against Defendants Ziegler, McLain, and Thompson in their individual capacities and granted Plaintiff's Application to Proceed Without Prepayment of Fees and Cost. (Document No. 9.) By Proposed Findings and Recommendation entered the same day, the

undersigned recommendation that Plaintiff's <u>Bivens</u>' claim against the BOP and its employees in their official capacities and his Section 1985 claim be dismissed. (Document No. 10.) On October 30, 2013, Plaintiff filed his Objections. (Document No. 19.)

On November 15, 2013, Plaintiff filed a "Motion for a Temporary Restraining Order and a Preliminary Injunction," Memorandum in Support, and Declaration. (Document Nos. 17, 18, 19.) In his Motion, Plaintiff requests as follows:

> [A]n order directing the defendants . . . to arrange for the plaintiff to be examined by a qualified parasitologist and to obtain from that specialist an evaluation of the condition of the plaintiff's stomach, intestines, colon and other associated areas of that region of the body and a prescription for a course of appropriate treatment that will restore and maintain the full function of his stomach, colon and abdominal digestive system.

(Document No. 17.) First, Plaintiff argues that he "is entitled to a temporary restraining order and a preliminary injunction" because he is "threatened with irreparable harm due to the nature of his intestinal disorder, to his stomach, digestive tract, organs and colon." (Document No. 23, pp. 3 - 4.) Plaintiff asserts that "[i]f he does not receive immediate proper treatment at this time, his intestinal organs may never be able to function normally again." (<u>Id.</u>, p. 4.) Second, Plaintiff contends that the "balance of hardships favor the Plaintiff." (<u>Id.</u>) Plaintiff explains that his present suffering is "ongoing" and "the potential [future] suffering if the parasite lodged in this stomach, intestine and colon region is not identified and treated by a parasitologist is enormous." (<u>Id.</u>) Third, Plaintiff states that he "has a great likelihood of success on the merit." (<u>Id.</u>, pp. 4 - 5.) Finally, Plaintiff claims that "the grant of relief will serve the public interest because it is always in the public interest for prison officials to obey the law, especially the U.S. Constitution." (<u>Id.</u>, p. 5.) As Exhibits, Plaintiff attaches the following: (1) A copy of Plaintiff's Affidavit (<u>Id.</u>, p. 8.); and (2) A copy of Plaintiff's "Declaration" (Document No. 24.).

4

On November 19, 2013, Defendants filed their Response in Opposition to Plaintiff's "Motion for a Temporary Restraining Order and a Preliminary Injunction." (Document No. 26.) First, Defendants request that "they be allowed to respond to this motion as well as the allegations of the complaint in one response." (Id., p. 1.) Defendants explain that "[a] comprehensive response will be more efficient use of judicial resources to decide whether the complaint states a cause of action, qualified immunity, and the other defenses which will be presented." (Id.) In the alternative, Defendants argue that the Motion should be denied. (Id.) Defendants explain that the West Virginia Board of Osteopathy dismissed Plaintiff's complaint and Plaintiff's Declaration "shows only that Plaintiff has a disagreement with the course of treatment prescribed by Dr. McLain." (Id., pp. 1 - 2.) Defendants note that a "disputed course of treatment is not actionable in a *Bivens* case and provides no basis for injunctive relief." (Id., p. 2.) As Exhibits, Defendants filed the followings: (1) A copy of a letter dated June 25, 2013, from the State of West Virginia Board of Osteopathic Medicine (Id., p. 4.); (2) A copy of a "Complaint Questionnaire" submitted to the State of West Virginia Board of Osteopathy (Id., pp. 5 - 7.); and (3) A copy of the "Order of Dismissal" from the West Virginia Board of Osteopathic Medicine (Id., pp. 8 - 10.)

On December 2, 2013, Defendants filed their "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 27 and 28.) Defendants contend that Plaintiff's Complaint should be dismissed based upon the following: (1) "Plaintiff cannot establish deliberate indifference to his medical condition" (Document No. 28, pp. 8 - 12.); (2) "Supervisory liability is unavailable" (Id., pp. 12 - 13.); (3) "The Defendants are entitled to qualified immunity" (Id., pp. 13 - 16.); and (4) "Plaintiff's request for injunctive relief should be denied" (Id., pp. 16 - 20.).

In support, Defendants filed the following Exhibits: (1) The Declaration of Dominick McLain, D.O. (Document No. 27-1, pp. 1, 24 - 27.); (2) A copy of a letter dated June 25, 2013, from the State of West Virginia Board of Osteopathic Medicine (Id., p. 2.); (3) A copy of a "Complaint Questionnaire" submitted to the State of West Virginia Board of Osteopathy (Id., pp. 3 - 5.); (4) A copy of the "Order of Dismissal" from the West Virginia Board of Osteopathic Medicine (Id., pp. 6 - 8.); (5) A copy of Harden v. Green, 27 Fed.Appx. 173 (4th Cir. 2001) (Id., pp. 9 - 16.); (6) A copy of Clinkscales v. Pamlico Correction Facility Medical Dept., 238 F.3d 411 (4th Cir. 2000) (unpublished) (Id., pp. 17 - 19.); (7) A copy of Malcomb v. RAJA, 2010 WL 31812354 (S.D.W.Va. Sept. 22, 2010) (Id., p. 20 - 21.); (8) A copy of the Declaration of Joel Ziegler (Id., p. 22.); (9) A copy of the Declaration of Kevin Thompson (Id., p. 23.); and (10) A copy of Plaintiff's medical records (Id., pp. 28 - 111.)

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on December 3, 2013, advising him of the right to file a response to the Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 29.) By Memorandum Opinion and Order entered on December 16, 2013, United States District Judge Irene C. Berger adopted the undersigned's recommendation and dismissed Counts I and II of Plaintiff's Complaint. (Document No. 35.)

On February 11, 2014, Plaintiff filed his Response to Defendant's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 42.) First, Plaintiff disagrees with Defendant McLain's statement that Plaintiff had no medical complaints upon his arrival at FCI Beckley. (Id., p. 2.) Plaintiff states that Health Services at FCI Beckley "already had knowledge of [his] prior medical complaints, lab records, and x-rays." (Id.) Second, Plaintiff contends that he went

to the x-ray department on July 12, 2010, because he "was scheduled to take x-rays." (Id., p. 3.) Third, Plaintiff disputes that he was fasting. (Id., pp. 4 - 5.) Plaintiff explains that he was "having trouble eating" because his "stomach hurt." (Id.) Fourth, Plaintiff indicates that he could not have had "normal bowel movements" because the records show that he had "hyper-active bowel sounds."[2] (Id., p. 5.) Fifth, Plaintiff argues that the stool test completed on September 22, 2010, is untrustworthy because the "type of organisms tested for under this methodology are not readily detected by this method." (Id., p. 6.) Sixth, Plaintiff explains that he failed to show for his November 24, 2010, appointment because "without a mandatory move on the Holiday week, chances of making a medical appointment is unlikely to happen." (Id., pp. 6 - 7.) Seventh, Plaintiff complains that on July 19, 2012, PA Cooper advised Plaintiff that he was cancelling Plaintiff's 9:00 a.m. appointment because he was "referring [Plaintiff] to Kevin Thompson and Dr. McLain." (Id., p. 12.) Eighth, Plaintiff states that he made numerous "computerized cop-outs," but Defendant McLain and Thompson delayed scheduling an appointment. (Id., p. 12 - 13, 34 - 36.) Ninth, Plaintiff complains that he continued to endure pain even though several different medications were prescribed. (Id., pp. 15 - 16.) Tenth, Plaintiff alleges that he did not receive any treatment from July 12, 2010, until December 17, 2010. (Id., p. 17.) Plaintiff further complains that he was "without medication" from March 14, 2011, until March 21, 2012, and from March 30, 2012, until October 28, 2013. (Id., pp. 18 - 19.) Eleventh, Plaintiff complains that he never received any type of pain medication. (Id., p. 19.) Twelfth, Plaintiff disputes that "all testing in the past was normal." (Id., pp. 23 - 24.) Plaintiff

---

[2] Plaintiff is referring to medical records from FDC [Federal Detention Center] Miami.

states that records from FDC Miami show "abnormal result pull chart."[3] (Id., p. 24.) Finally, Plaintiff argues that Defendant Ziegler can be held liable because he continually notified Defendant Ziegler that he was not receiving proper medical treatment. (Id., pp. 25 - 27.) Plaintiff claims that inaction by Defendant Ziegler caused a "domino effect" resulting in Defendant McLain failing to provide proper medical care. (Id., p. 29.)

As Exhibits, Plaintiff attaches a copy of the following: (1) A copy of the Declaration of Inmate M. Monteverdi (Document No. 42-1, p. 1.); (2) A copy of an Affidavit by Inmate Charles Thomason (Id., p. 2.); (3) A copy of an Affidavit by Inmate Michael Anderson (Id., p. 3.); (4) A copy of Plaintiff's "Journal Pages" (Id., pp. 4 - 11.); (5) A copy of his "Mandatory Call Out" for January 7, 2014 (Id., p. 12.); (6) A copy of pertinent medical records (Id., pp. 13 - 14, 26 -27, 31 - 46 and Document No. 42-2, pp. 2 - 13, 15 - 29, 34 - 38); (6) A copy of "Inmate Requests to Staff" (Document No. 42-1, pp. 15 - 16, 18 - 24, 28 - 29 and Document No. 42-2, pp. 14, 32 - 33, 39.); (7) A copy of a letter addressed to Warden Ziegler dated May 3, 2012 (Document No. 42-1, p. 17.); (8) A copy of Plaintiff's "Incident Report" dated July 12, 2010 (Id., p. 30.); (9) A copy of "Inmate to Staff Messages" (Document No. 42-1, p. 25 and Document No. 42-2, pp. 1, 30 - 31.); (10) A copy of Plaintiff's "The Declaration of Kevin Thompson, H.S.A., Relevant to Perjury" (Document No. 42-3.); (11) A copy of Plaintiff's "Declaration of Joel Zielger, the Warden for FCI Beckley, Inst., is Insufficient for Admissibility as to Paragraph 4" (Document No. 42-4.); and (12) A copy of Plaintiff's "Declaration of Dominick McLain, D.O., Relevant to Perjury" (Document No. 44.).

Also on February 11, 2014, Plaintiff filed his "Reply to Defendants' Response to Plaintiff's

---

[3] Plaintiff is referring to abnormal lab results from 2006, 2007, and 2009, conducted while he was an inmate at FDC Miami. (Document No. 42-2, pp. 5 - 9.)

Motion for a TRO/Preliminary Injunction Order." (Document No. 43.) First, Plaintiff explains that "no documents were given to support Plaintiff's claim before the West Virginia Board of Ostepathy." (Id., p. 2.) Second, Plaintiff complains that Defendants never provided a course of treatment. (Id.) Third, Plaintiff states he has a gastro-intestinal abnormality because his medical records show a "large amount of gas and stool in colon." (Id., p. 3.) Plaintiff continues to argue that his motion should be granted because he "is in dire need of hospitalization." (Id., p. 5.)

On February 18, 2014, Defendants filed a Reply arguing that "Plaintiff's Responses consist of unsworn affidavits and unsupported arguments by Plaintiff with the entries in his medical record, to which Defendants' object and move to strike." (Document No. 45.)

## FACTUAL HISTORY

Plaintiff arrived at FCI Beckley on March 29, 2010, and was evaluated by a Physician Assistant ["PA"] David Hutchison. (Document No. 27-1, pp. 1, 51 - 54.) Plaintiff reported no medical complaints upon his arrival. (Id.) PA Hutchinson "instructed inmate on how to obtain medical, dental, and mental health care." (Id., p. 54.) On April 7, 2010, PA Hutchinson completed Plaintiff's medical history and physical. (Id., pp. 55 - 64.) Plaintiff denied any rectal complaints, "abdominal pain or colic," bloating, blood in stools, constipation, diarrhea, or any "current painful condition." (Id., pp. 57, 59, 63.) On July 12, 2010, Plaintiff appeared in Health Services and sat in a chair next to the x-ray department. (Id., pp. 49 - 50.) Plaintiff refused to leave until he was evaluated by a doctor stating that "he had a tapeworm that was eating his insides out and he needed an immediate surgery." (Id.) PA Cooper noted that Plaintiff was in no apparent distress and appeared well, but argumentative. (Id.) Plaintiff was escorted to the Special Housing Unit ["SHU"] after he refused three opportunities to leave the medical department. (Id.) Plaintiff received a disciplinary

9

infraction based upon the above conduct. (Id., p. 24 and Document No. 42-1, p. 30.)

On July 27, 2010, Plaintiff was evaluated by a Registered Nurse ["RN"]. (Document No. 27-1, pp. 47 - 48.) The RN noted that Plaintiff appeared well, with "no significant findings/no apparent distress/no injuries noted." (Id.) On September 3, 2010, Plaintiff complained that he was "not on a hunger strike," but that his "stomach hurts and [he] has trouble eating." (Id., p. 44 - 46.) Plaintiff stated that he had aching abdominal pain and rated his pain as a 5 on a scale of 10. (Id., p. 44.) Plaintiff was evaluated by RN Jason Howard, who noted that Plaintiff's temperature, pulse, respiration and blood pressure were unremarkable. (Id.) RN Howard further noted that Plaintiff appeared well with no apparent distress. (Id.) RN Howard examined Plaintiff's abdomen noting that Plaintiff had normal active bowel sounds and his abdomen was soft with no rigidity. (Id.) Although Plaintiff complained of tenderness on palpation, he reported normal bowel movements. (Id., p. 45.) RN Howard scheduled Plaintiff an appointment with a PA and instructed Plaintiff to follow-up at sick call as needed. (Id.)

On September 7, 2010, Plaintiff reported to Health Services complaining that of a "biting feeling inside his stomach from a tapeworm." (Id., pp. 40 - 43.) Plaintiff reported that he only "eats occasionally" because "he doesn't want to feed the worm." (Id., p. 40.) Plaintiff requested that a colonoscopy be performed even though he denied diarrhea, constipation, or blood in his stool. (Id.) Plaintiff was evaluated by Nurse Practitioner ["NP"] James Ellis, who noted that Plaintiff appeared well with no apparent distress. (Id., p. 41.) NP Ellis examined Plaintiff noting that his abdomen appeared normal on inspection, was soft and non-tender on palpation, and Plaintiff had normal active bowel sounds. (Id.) NP Ellis ordered two stool tests for parasites and directed Plaintiff to follow-up at sick call as needed. (Id., p. 42.) The stool tests were completed on September 22, 2010,

revealing negative results for parasites. (Id., p. 66.)

On November 24, 2010, Plaintiff failed to report for his "sick call call-out" appointment regarding his complaint of "stomach pain, vomiting, and bleeding." (Id., p. 39.) On December 1, 2010, Plaintiff reported to Health Services complaining "of vague abdominal symptoms." (Id., pp. 34 - 38.) Specifically, Plaintiff stated that "he can feel something 'crawling around in my lower abdomen and now it is resting against my spine, but it moves aground inside of me. I can feel my intestines bleeding inside and feel the blood dripping inside me. I know I have a tapeworm and this thing is huge. I grew up on a farm, so I know I have one.'" (Id., p. 34.) Plaintiff denied "any bright red blood with stools, dark/tarry stools or complications with bowel movements." (Id.) Plaintiff was examined by PA Joe Cooper, who noted that Plaintiff had normal active bowel sounds and his abdomen appeared normal with no bulges, masses, hernias, or distension. (Id., p. 35.) PA Cooper further noted that Plaintiff's abdomen was soft, non-tender on palpation, and no guarding or rigidity. (Id.) PA Cooper conducted an anus and rectum exam, which revealed "brown stool on glove, normal tone," "no fecal occult blood or tenderness," and the guaiac stain was negative. (Id.) PA Cooper further performed a prostate exam, which revealed "normal size" with "no tenderness on palpation, masses, or nodules." (Id.) PA Cooper noted that Plaintiff had gained 11 pounds since September, 2010. (Id.) PA Cooper ordered a general urinalysis test, a general comprehensive metabolic profile, general hepatic profile, general complete blood count, and an x-ray of Plaintiff's abdomen. (Id., p. 36.) PA Cooper also requested a psychiatric evaluation. (Id.)

Plaintiff's psychiatric evaluation was conducted on December 13, 2010. (Id., pp. 32 - 33.) On December 17, 2010, Plaintiff reported to Health Service complaining of continued "pain in his right upper abdomen area and feels 'irregular movement inside my colon.'" (Id., pp. 28 - 31.)

11

Plaintiff reported having bowel movements "every one to two days," denied "dark tarry stools or bright red blood with bowel movements," and denied "fevers, chills, night sweats, or appetite changes." (Id., p. 28.) Plaintiff was examined by PA Cooper, who noted that Plaintiff's abdomen appeared normal on inspection with normal active bowel sounds, soft and non-tender on palpation, and no guarding. (Id., p. 29.) PA Cooper prescribed Ranitidine for abdominal pain and ordered additional laboratory testing. (Id., p. 30.) The lab results revealed that Plaintiff's cholesterol level was high and his white blood count was slightly low.[4] (Document No. 42-2, p. 10.)

On January 28, 2011, Plaintiff reported to Health Service complaining of continued abdominal pain. (Document No. 27-1, pp. 76 - 79.) Specifically, Plaintiff stated that he "can see his belly move around," that he "has a parasite or a worm in his abdomen that is moving around inside of him," and that "he can feel blood dripping inside [him]." (Id., p. 76.) Plaintiff denied "dark stools or bleeding with bowel movements." (Id., p. 77.) Plaintiff was evaluated by PA Cooper and Dr. McLain, who noted that Plaintiff's recent labs and stool cultures were unremarkable and the recent abdominal radiology report was negative except for stool and gas in colon. (Id.) Dr. McLain examined Plaintiff's abdomen noting that it appeared normal, soft, non-tender on palpation, no guarding, no masses, and normal active bowel sounds. (Id., p. 77.) Dr. McLain prescribed Citrate of Magnesia for abdominal pain and ordered an "abdominal ultrasound to include intestines, stomach, gall bladder, live and kidneys." (Id.)

On March 14, 2011, Plaintiff inquired about the status of his abdominal ultrasound and requested a refill of the Citrate of Magnesia. (Id., pp. 74 - 75.) Plaintiff denied any changes with his

---

[4] The normal white blood count range is 4.0 to 11.0. Plaintiff's white blood count was 3.1 (Document No. 42-2, p. 10.)

abdominal symptoms. (Id., p. 74.) PA Cooper noted that Plaintiff's "ultrasound is scheduled in near future" and refilled the Citrate of Magnesia prescription. (Id., p. 75.) Plaintiff's abdominal ultrasound was conducted on March 18, 2011. (Id., p. 73.) The ultrasound was negative for any abnormalities. (Id., p. 25.)

On June 28, 2011, Plaintiff reported to sick call complaining of cold or flu symptoms. (Id., pp. 70 - 72.) NP Ellis diagnosed Plaintiff with acute sinusitis and prescribed Erythromycin. (Id.) On August 3, 2011, Plaintiff reported to Health Services with a work related injury. (Id., pp. 67 - 69.) Plaintiff stated that he "was lifting a piece of metal and scratched my arm." (Id., p. 67.) RN Keith Rose examined Plaintiff noting an "abrasion to the right forearm." (Id.) Plaintiff was advised on proper wound care and instructed to follow-up at sick call as needed. (Id.)

On January 4, 2012, Plaintiff reported to Health Services complaining of abdominal pain. (Id., pp. 105 - 108.) Specifically, Plaintiff stated that he "feels bloated, has loose stools daily, feels like he still has a 'tapeworm eating my insides,' he can feel it biting him at times, and his belly make noises 'like a washing machine.'" (Id., p. 105.) Plaintiff denied bleeding with bowel movements. (Id., p. 106.) Plaintiff was evaluated by PA Cooper, who noted that Plaintiff had gained 17 pounds since January, 2011. (Id.) PA Cooper examined Plaintiff's abdomen noting that it appeared normal, soft, non-tender on palpation, and no guarding. (Id.) PA Cooper ordered additional laboratory testing and instructed Plaintiff to take an over-the-counter fiber supplement. (Id.) An additional abdominal ultrasound was conducted on January 9, 2012, which revealed normal findings. (Id., pp. 104, 111.)

On February 3, 2012, Plaintiff again reported to sick call complaining of "worms moving around in my abdomen." (Id., pp. 99 - 103.) Plaintiff stated that his "last bowel movement was two days ago and 'hard.'" (Id., p. 99.) Plaintiff was evaluated by PA Cooper, who noted that Plaintiff's

recent ultrasound was normal and his past stool cultures were normal. (Id.) PA Cooper noted that "[r]ecent blood work is pending, however, he has had unremarkable CBCs in the past." (Id.) PA Cooper examined Plaintiff's abdomen noting it appeared normal, soft, non-tender on palpation, no guarding, and normal active bowel sounds. (Id., p. 100.) PA Cooper instructed Plaintiff to continue the over-the-counter fiber supplement. (Id.)

On March 14, 2012, Dr. Roger Edwards evaluated Plaintiff concerning his continued complaints of abdominal pain. (Id., pp. 89 - 98.) Plaintiff continued to state that he "feels that he has worms in his abdomen." (Id., pp. 89 and 92.) Dr. Edwards examined Plaintiff's abdomen noting no guarding, no rigidity, soft, and normal active bowel sounds. (Id., pp. 90 and 93.) Dr. Edwards noted that Plaintiff did have tenderness on palpation, but tenderness was "diffuse, spotty, inconsistent" and there was "no peritoneal signs, masses, or rebound." (Id.) Dr. Edwards further noted that Plaintiff's "lab studies have been essentially normal as was his abdominal ultrasound." (Id., pp. 89 and 92.) Dr. Edwards stated that Plaintiff was "once again apprised of his previous physical findings," but "is still concerned he has a worm." (Id.) Dr. Edwards noted that Plaintiff was "agreeable to empirical treatment with Vermox.[5]" (Id.)

On March 30, 2012, Plaintiff reported to Health Services stating that "although the medication 'helped' his discomfort, he feels that the worms 'curled up' and resisted the medication." (Id., pp. 87 - 88.) Plaintiff stated that "he feels that a 'very powerful medication' would enable him to 'eliminate the element from the system.'" (Id., p. 87.) Dr. Edwards reassured Plaintiff that "his exam and studies did not reveal any evidence of any such infestation or other pathology." (Id.) Plaintiff stated that he "was agreeable to whole bowel cleansing with carthartic." (Id.) Dr. Edwards

---

[5]  Vermox is a "medication used to treat worms." (Document No. 27-1, p. 26.)

prescribed an electrolyte solution and requested a psychiatry consult. (Id., p. 88.)

On April 10, 2012, Plaintiff again complained that he had a parasite in his abdomen and needed "specialized treatment to solve his ailment." (Id., p. 86.) PA Cooper noted that Plaintiff had a pending psychiatry consult. (Id.) On May 15, 2012, Plaintiff reported to Health Services complaining that he has had a "parasite that is eating away at me" since 2006. (Id., pp. 83 - 85.) Plaintiff stated that he took "Metronidazole for a while and felt the 'biomass contracted about 30%' for a brief period of time." (Id., p. 83.) Plaintiff further stated that he "can feel the 'parasite moving through my belly and biting my kidney at times,'" it feels "like 'an egg drops to one side of my stomach when I lay down at night," and "sometimes he has 'three biomasses that get really huge at times.'" (Id.) Dr. McLain evaluated Plaintiff noting that Plaintiff has "seen psychiatry," "had two abdominal ultrasounds in the past year that were unremarkable," "labs have been normal," and "a normal stool exam at the lab about 1 ½ years ago." (Id.) Dr. McLain examined Plaintiff noting that his abdomen was soft, non-tender on palpation, no guarding, no rigidity, and normal active bowel sounds. (Id., p. 84.) Dr. McLain ordered additional stool tests, which were obtained the same day. (Id.) A hemoccult on the specimen was conducted, and it was negative for occult blood. (Id.) Dr. McLain stated that he "feels patient is fixated on the issue he has parasites or biomass in his abdomen and [he] could not convince him otherwise." (Id.) The lab results for the stool tests revealed "light normal fecal flora," "negative for presence of Shiga toxin 1," "negative for the presence of Shiga toxin 2," and "negative for Salmonella, Shigella, Campylobacter, and Yersinia." (Id., p. 110.)

On July 20, 2012, PA Cooper reviewed with Plaintiff the negative results from the recent stool culture. (Id., pp. 80 - 82.) Plaintiff requested "evaluation for colonoscopy to help put this

matter to rest." (Id., p. 80.) PA Cooper noted as follows: "38 your old black male with history of vague abdominal complaints, including 'biomasses' moving around in his abdomen and 'biting' him at times. Recent stool cultures have been negative. Has been evaluated numerous times via sick call by myself, Dr. Edwards, and clinical director Dr. McLain. All exams have been unremarkable." (Id.) PA Cooper submitted a consult request for a colonoscopy. (Id.) The Utilization Review Committee denied the request for the colonoscopy finding it was not medically necessary because there were no clinical findings to warrant the test. (Id., p. 109.) Plaintiff did not report back to Health Services for any further complaints until October 28, 2013. (Id., p. 27.)

Between July 20, 2012, and October 28, 2013, Plaintiff submitted "Request to Staff." (Document No. 42-1, pp. 15, 21 - 23, 28 - 29.) On August 26, 2012, Plaintiff submitted a "Request to Staff" seeking an appointment be scheduled with Defendant McLain. (Id., p. 21.) By "Request to Staff" dated September 4, 2012, Plaintiff complained that his "health issue still remains the same, I need specialized examinations done." (Id., p. 22.) On November 6, 2012, Plaintiff submitted a "Request to Staff" requesting that Defendant Thompson "work something out with Dr. McLain about a dietary supplement." (Id., p. 23.) By "Request to Staff" dated October 7, 2013, Plaintiff requested that Defendant Thompson scheduled Plaintiff an appointment with Dr. McLain. (Id., p. 28.) On October 10, 2013, Plaintiff submitted a "Request to Staff" seeking that Dr. McLain scheduled him an appointment with a "parasite-specialist." (Id., p. 15.) By "Request to Staff" dated October 18, 2013, Plaintiff acknowledged that he spoke to Defendant McLain at main-line and Defendant McLain instructed Plaintiff that "You have to make sick-calls for a doctor to see you . . . I will start making sick-call." (Id., p. 29.) The record reveals that Plaintiff reported back to Health Services on October 28, 2013. (Document No. 27-1, p. 27.) Lab results were collected on November

16

6, 2013, revealing a slightly elevated TBIL level and a slightly low white blood count and monocytes number.[6] (Document No. 42-2, pp. 11 - 12.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.

---

[6] Plaintiff's TBIL was 1.3 and the normal range is 0.2 - 1.0. Plaintiff's white blood count was 3.2 and the normal range is 4.0 - 11.0. Plaintiff's monocytes number was 0.2 and the normal range is 0.3 - 1.1. (Document No. 42-2, pp. 11 - 12.)

Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause

18

of the Fifth Amendment.) A <u>Bivens</u> action is the federal counterpart of an action under 42 U.S.C.

§ 1983. An action for money damages may be brought against federal agents acting under the color

of their authority for injuries caused by their unconstitutional conduct. Proof of causation between

the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting

a claim under <u>Bivens</u> must show the violation of a valid constitutional right by a person acting under

color of federal law.[7]

## 1.      <u>No Evidence of Deliberate Indifference.</u>

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing,

shelter, sanitation, medical care and personal safety." <u>Wolfish v. Levi</u>, 573 F.2d 118, 125 (2d Cir.

1978), *rev'd on other grounds*, <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

<u>See also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811

(1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials

to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take

reasonable measures to guarantee the safety of the inmates.'"), quoting <u>Hudson v. Palmer</u>, 468 U.S.

---

[7] Inmates may file claims of liability against the United States under the FTCA but may not
assert claims of personal liability against prison officials for violations of their constitutional rights.
*Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may
assert claims of personal liability against individual prison officials for violations of their constitutional
rights but may not assert claims against the government or prison officials in their official capacities.
The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could
pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend
to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history
of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary
causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth
Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens*
action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other
distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are
available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens*
and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the

applicable standard in <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

<u>See also</u> <u>Sosebee v. Murphy</u>, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978), <u>cert. denied</u>, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. <u>See</u> <u>Farmer</u>, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, *supra*, 511 U.S. at 837, 114 S.Ct. at

1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

Plaintiff alleges that Defendants acted with deliberate indifference in providing medical treatment for his intestinal condition. Defendants contend that Plaintiff cannot establish that Defendants acted with deliberate indifference to his medical condition. (Document No. 28, pp. 8 - 12.) Defendants first argue that "Plaintiff does not suffer an intestinal condition, as he alleges, and thus he cannot satisfy the objective component of showing a serious medical need." (Id., p. 9.) Furthermore, Defendants argue that even assuming Plaintiff's intestinal complaints to be a serious medical condition, Plaintiff received timely and appropriate medical treatment. (Id., pp. 9 - 10.)

In Response, Plaintiff alleges that he has a "degenerating intestinal abnormality" and Defendants' attitudes have been "hostile, callous and uncaring." (Document No. 42.) Plaintiff alleges that he has "continuously endured extremely persistent, excruciating and debilitating intestinal pain." (Id.)

 For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Plaintiff alleges that his intestinal condition causes continuous pain. Accordingly, the undersigned will assume for purposes this motion that Plaintiff's intestinal condition is serious enough to give rise to an Eighth Amendment claim.

Next, the undersigned will consider whether Defendants acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component,

Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends that Defendants acted with deliberate indifference in failing to properly diagnose and treat "an unknown parasite that continues to live, grow, and flourish in Plaintiff's intestinal tract." Plaintiff first notified medical staff at FCI Beckley of his alleged intestinal condition on July 12, 2010. (Document No. 27-1, pp. 49 - 50.) Specifically, Plaintiff stated "he had a tapeworm that was eating his insides out and he needed an immediate surgery." (Id.) PA Cooper evaluated Plaintiff noting that he was in no apparent distress and appeared well, but argumentative. (Id.) Approximately two weeks later, a RN re-evaluated Plaintiff noting that Plaintiff appeared well with no significant findings or distress. (Id., pp. 47 - 48.) On September 3, 2010, Plaintiff again reported to Health Services complaining of "trouble eating" and abdominal pain. (Id., pp. 44 - 46.) Plaintiff was evaluated by RN Howard, who noted that Plaintiff's abdominal exam was normal with active bowel sounds and Plaintiff reported normal bowel movements. (Id.) RN Howard scheduled Plaintiff a follow-up appointment with a PA. (Id.) Four days later, Plaintiff again reported to Health Services complaining of a "bitting feeling inside my stomach from a tapeworm." (Id., pp. 40 - 43.) Plaintiff denied diarrhea, constipation, or blood in his stool. (Id.) Although NP Ellis evaluated Plaintiff noting that his abdominal exam was normal, NP Ellis ordered two stool tests for parasites. (Id.) The stool tests were completed on September 22, 2010, which revealed negative results of parasites. (Id., p. 66.)

Plaintiff failed to report for his sick call appointment on November 24, 2010. (Id., p. 39.) On December 1, 2010, Plaintiff reported to Health Services stating that he had a tapeworm and he could feel it "crawling around in [his] lower abdomen" and he could "feel [his] intestines bleeding inside and feel the blood dripping inside [him.]" (Id., pp. 34 - 38.) Plaintiff was thoroughly evaluated by

PA Cooper, who noted a normal abdominal, anus, rectum, and prostate examine. (Id.) Although PA Cooper noted that Plaintiff had gain 11 pounds since September, PA Cooper ordered an abdomen x-ray and labs. (Id.) The labs results were unremarkable and the abdominal x-ray was negative except for stool and gas in the colon. (Id., p. 77.) Approximately two weeks later, Plaintiff again reported to Health Service complaining of abdominal pain and "irregular movement inside my colon." (Id., pp. 28 - 31.) PA Cooper evaluated Plaintiff, who denied dark tarry stools, bright red blood with bowel movements, fevers, chills, night sweats, or appetite changes. (Id.) PA Cooper completed an abdominal exam, which revealed normal findings. (Id.) PA Cooper prescribed mediation for abdominal pain and ordered additional labs. (Id.) On January 28, 2011, Plaintiff again complained of a "parasite or worm in his abdomen." (Id., pp. 76 - 79.) PA Cooper and Defendant McLain evaluated Plaintiff, who again denied dark stools or bleeding with bowel movements. (Id.) Defendant McLain performed an abdominal exam, which revealed normal findings. (Id.) Although Defendant McLain noted that Plaintiff's recent labs and stool cultures were unremarkable and the abdominal x-ray was negative, Defendant McLain ordered an abdominal ultrasound and prescribed Citrate of Magnesia for abdominal pain. (Id.) Plaintiff inquired about the status of his ultrasound on March 14, 2011. (Id., pp. 74 - 75.) The abdominal ultrasound was conducted four days later, and was negative for any abnormalities. (Id., pp. 25 and 73.)

Plaintiff did not report any other abdominal complaints until January 4, 2012, when he again complained of a "tapeworm eating my insides," "loose stools daily," and his stomach making noises "like a washing machine." (Id., pp. 105 - 108.) Plaintiff was evaluated by PA Cooper, who noted that Plaintiff's abdominal exam was normal and Plaintiff had gain 17 pounds since January 2011. (Id.) PA Cooper ordered additional labs, directed Plaintiff to take a fiber supplement, and ordered another

abdominal ultrasound. (Id.) The ultrasound was completed five days later, and revealed normal findings. (Id., pp. 104 and 111.) On February 3, 2012, Plaintiff again complained of "worms moving around in [his] abdomen." (Id., pp. 99 - 103.) PA Cooper evaluated Plaintiff noting a normal abdominal exam and normal results from past testing. (Id.) PA Cooper instructed Plaintiff to continue the fiber supplement and follow-up at sick call as needed. (Id.) On March 14, 2012, Plaintiff was examined by Dr. Edwards. (Id., pp. 89 - 98.) Dr. Edward advised Plaintiff that his lab studies were "essentially normal" and the abdominal ultrasounds were normal, but Plaintiff continued to state that he was "concerned he has a worm." (Id.) Dr. Edwards noted that Plaintiff was "agreeable to empirical treatment" and prescribed a medication used to treat worms. (Id.) Approximately two weeks later, Plaintiff reported to Health Services stating that the medication had "helped" but he believed the worms "curled up" and resisted the medication. (Id., pp. 87 - 88.) Dr. Edwards evaluated Plaintiff and again explained that there was no evidence that he had worms. (Id.) Plaintiff stated that he was agreeable to a whole bowel cleansing and Dr. Edwards prescribed an electrolyte solution. (Id.) On April 10, 2012, Plaintiff again reported to Health Services requesting specialized treatment for the parasite in his abdomen. (Id.) PA Cooper noted that Plaintiff had a pending psychiatry consult. (Id.)

Approximately a month later, Plaintiff again complained that a parasite was "eating away" at him and he had "three biomasses." (Id., pp. 83 - 85.) Defendant McLain examined Plaintiff's abdomen noting normal findings and reviewed the normal results of past testing. (Id.) Defendant McLain ordered additional stool tests, which were obtained the same day. (Id.) The results for the stool tests were negative for occult blood and parasites. (Id., p. 110.) On July 20, 2012, PA Cooper reviewed the negative results of the stool test with Plaintiff. (Id., pp. 80 - 82.) Plaintiff requested a

colonoscopy and PA Cooper submitted a consult request for the test. (Id.) The Utilization Review Committee determined that the colonoscopy was "not medically necessary" and denied the request. (Id., p. 109.) Plaintiff did not report back to Health Services for any further complaints until October 28, 2013. (Id., p. 27.)

Based upon the foregoing, Plaintiff cannot satisfy the subjective component. The Court finds that Defendants did not act with deliberate indifference in providing medical treatment for Plaintiff's alleged intestinal condition. The record reveals that Defendants evaluated Plaintiff and provided treatment following each sick-call request. Defendants consistently evaluated Plaintiff's condition, ordered stool tests and labs, ordered abdominal ultrasounds and an x-ray, and prescribed medication for abdominal pain and worms. There is no evidence that Defendants or medical staff at FCI Beckley knowingly disregarded Plaintiff's need for treatment of his alleged intestinal condition. Further, the record does not support Plaintiff's conclusion that Defendants acted with deliberate indifference by failing to conduct further testing and failing to refer him to a "parasite specialist." The record reveals that Defendants made sufficient efforts to diagnose and treat Plaintiff's alleged intestinal condition. Thus, Plaintiff appears to simply disagree with the appropriate course of treatment. An inmate's disagreement with his medical care or the course of treatment for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication

over another does not give rise to a constitutional violation.") Accordingly, the undersigned finds that Defendants did not act with deliberate indifference in providing medical treatment for Plaintiff's alleged intestinal condition.[8]

**2.      Plaintiff's claims based upon a theory of *respondeat superior*.**

Plaintiff names the following supervisory officials as Defendants: (1) Joel Ziegler, Warden of FCI Beckley; and (2) Kevin Thompson, Health Services Administrator. Plaintiff appears to contend that Defendants Ziegler and Thompson violated his constitutional rights by failing to ensure that he received proper medical treatment. (Document No. 1.)

Defendants Ziegler and Thompson contend that they are entitled to summary judgment because Plaintiff's claims against them are improperly raised under the doctrine of *respondeat superior*. (Document No. 28, pp. 12 - 13.) Defendants argue that Defendant Ziegler "is responsible for the general oversight of the prison," and Defendant Thompson "is responsible for the general oversight of the Health Services Department." (Id., p. 13.) Defendants contend that "[a]s administrators, these defendants did not treat or make treatment decisions concerning Plaintiff's care." (Id.) Thus, Defendants Zeigler and Thompson argue that their supervisory position and the general notion that they are responsible for the actions of their subordinates is simply insufficient to form the basis of a claim for violations of a constitutional right, and they must be dismissed from this action. (Id.) In support, Defendant Zeigler attaches a copy of his Declaration stating that "I do not treat or make treatment decisions concerning inmates at the facility. Rather, I rely on judgment

---

[8]  To the extent Plaintiff is alleging that Defendants are negligent in failing to diagnose and treat his alleged condition, his claim is without merit. *Webb v. Hamidullah*, 281 Fed.Appx. 159, 166 (4th Cir. 2008); *also see Sosebee v. Murphy*, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

of the Clinical Director, Staff Physicians and other medical staff within the Health Services Department to make treatment decisions for inmates at FCI Beckley." (Document No. 27-1, p. 22.) Defendant Thompson attaches a copy is his Declaration stating that "I do not treat or make treatment decisions concerning inmates at the facility. Rather I rely on judgment of the Clinical Director, Staff Physician, and other medical staff within the Health Services Department to make treatment decision for inmates at FCI Beckley." (Id., p. 23.)

In Response, Plaintiff argues that Defendant Ziegler and Thompson are responsible for his lack of proper medical treatment (Document No. 31, p. 5.) Specifically, Plaintiff contends that Defendants Ziegler and Thompson failed to scheduled him an appointment with Defendant McLain, failed to ensure that Defendant McLain placed Plaintiff on a liquid diet, and failed to required Defendant McLain to referred Plaintiff to a "parasite specialist." (Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 129 S.Ct. at 1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Also see Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates'

28

misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Plaintiff fails to demonstrate specifically how Defendants Ziegler and Thompson were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendants violated his constitutional rights with respect to their failure to supervise employees and in responding to his administrative remedies. The evidence of record reveals that Defendants responded to administrative remedy requests filed by Plaintiff. Plaintiff, however, has shown no other personal involvement by Defendants. The dismissal of a non-medical defendant is appropriate where the defendant's sole involvement is the denial of an administrative remedy request. See Fellove v. Heady, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state *Bivens* claim"); Mabry v. Ramirez, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a *Bivens* claim for deliberate indifference to serious medical needs"); Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003), aff'd, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly

29

authorized or were indifferent to a prison physician's conduct. <u>Lewis v. Angelone</u>, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. <u>Miltier v. Born</u>, 896 F.2d 848, 854 - 55 (4th Cir. 1990). Finally, there is no evidence that Defendants Ziegler or Thompson were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct.[9] Accordingly, Plaintiff has improperly raised his claim against Defendants Ziegler and Thompson under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The Court therefore finds that Defendants Ziegler and Thompson's Motion to Dismiss, or in the Alternative Motion for Summary Judgment should be granted. The undersigned finds it unnecessary to consider the other reasons which the Defendants have submitted for dismissal.

3.   <u>**Motion for Temporary Restraining Order and a Preliminary Injunction**</u>:

Rule 65(b) of the Federal Rules of Civil Procedure sets forth the limited circumstances under which a temporary restraining order can be granted as follows:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

The Fourth Circuit explained the different functions of temporary restraining orders and preliminary injunctions in <u>Hoechst Diafoil Company v. Nan Ya Plastics Corporation</u>, 174 F.3d 411, 422 (4th Cir.

---

[9]   As stated above, a review of Plaintiff's medical records reveal that Plaintiff's medical complaints were continuously and adequately evaluated by medical staff at FCI Beckley.

1999), as follows:

> While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held: '[U]nder federal law [temporary restraining orders] should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.' Granny Goose, 415 U.S. at 439.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

Based upon the foregoing, the undersigned has recommended that Plaintiff's Complaint be dismissed as to all Defendants. Accordingly, the undersigned finds that Plaintiff's request for injunctive relief should be denied as he cannot establish that he is likely to succeed on the merits.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 27.), **DENY** Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction (Document No. 22.), **DISMISS** Plaintiff's Complaint (Document Nos. 6 and 7.) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have seventeen (17) days (fourteen days,

filing of objections and three days, mailing/service) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Berger and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Petitioner, who is acting *pro se*, and transmit a copy to counsel of record.

Date: June 13, 2014.

R. Clarke VanDervort
United States Magistrate Judge